IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA * | |
| v.   * | Case NO.2:07cr70-WHA |
| COURTNEY JERVONNE CASEY,   * | |
|    Defendant.   * | |

**OBJECTION TO REPORT AND RECOMMENDATION
OF THE MAGISTRATE JUDGE**

Comes now COURTNEY JERVONNE CASEY , the Defendant, through his Counsel of Record, Paul R. Cooper, and hereby files his objection to the Report and Recommendation of the Magistrate Judge. As grounds, he states as follows:

**I. PROCEDURAL BACKGROUND**:

Courtney J. Casey is charged in a sealed Indictment (Doc. 1), filed April 4, 2007 in the United States District Court for the Middle of Alabama.  This is a multi-defendant, multi-count indictment. Casey is charged in Count 6  as an ex-felon in possession of firearms:  an Ithaca, Model M-66, 20 gauge shotgun and an Iver Johnson Model Champion .410 Shotgun,  in violation of 18 U.S.C.§ 922(g)(1).  In count 7 he is charged with the possession of the  Ithaca, Model M-66, 20 gauge shotgun, not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §5861(d).

**II. FACTS**:-GOOD SAMARITAN-TURNED-TRAFFIC STOP

1

Mann borrowed a car from a friend in Florida to drive to Atlanta to look for someone. After several days in Atlanta, the parties left Atlanta to return to Florida with Murphy driving. While Mann and Casey slept, Murphy took the wrong Interstate, I-85, and came to Montgomery, then turned on I-65 headed South. On December 21, 2005, Casey, a passenger was riding in a vehicle along with co-defendants Demetria Cheri Murphy, the driver, and Perez Allen Mann, a passenger. Murphy was driving the two door, 2000 Ford Explorer when it stopped running at mile marker 165 on Interstate 65 within the Middle District of Alabama. Casey, Murphy, and Mann obtained help and gas. However, the car would not start.

Trooper Shawn Loughridge stopped to assist the defendants. He pulled behind the Defendants and approached them. Loughridge and Mann began to have words. Mann told Loughridge on several occasions that his help was not needed. Mann called his Father on his cell phone, and Loughridge talked to Mann's father. Mann is a large man, much larger than Loughridge. Loughridge threatened Mann by telling him that he could be arrested. Loughridge was suspicious and skeptical enough to call in another trooper for help while he was searching (ostensibly assisting) the Defendants.

Loughridge would not leave when requested and persisted in advising Defendants that they needed to open the rear view cargo door to find a fuel shut off valve in order to start the vehicle.

The defendants began to get nervous, and Mann became belligerent.

Having threatened to arrest Mann, calling in back-up to protect him while he searched the car while two males looked on, and generally intimidating the co-defendants, Loughridge intimidated Murphy into assisting him to open the rear cargo door to find the Ford fuel cut-off switch. Loughridge testified that he had a lot of experience in traffic accidents with the Ford fuel cut-off switch. He advised the Defendants it was in the rear cargo area, after searching under the hood and in the front seats.

Murphy pushed from the inside the rear cargo area and Loughridge pulled it open from the inside. Once inside, he began to rifle through clothing and found the butts of two firearms. He started the guns were in plain view. He found One Ithica shotgun, and One Iver Johnson, sawed-off, shotgun, which was an unregistered firearm -with no serial number- and a body armor vest.

All defendants were arrested for being in possession of the sawed-off shotgun, the Iver Johnson in State District Court. Later, Casey was interviewed by Special Agents Timothy Fitzpatrick and Jennifer Rudden of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and gave a statement after he signed a waiver of his Miranda Rights.

### III. ISSUES PRESENTED:

A. Does Casey have standing as a passenger to object to an unlawful search and seizure.

B. Did this Good Samaritan stop by the Loughridge turn in a traffic stop?

C. If so, did Loughridge exceed the scope of his right to detain, and engage in an unlawful search and seizure which justify excluding all evidence and statements given.

**IV. DISCUSSION**

A. **CASEY HAS STANDING -** On June 18, 2007, the United States Supreme Court held in a traffic stop case "that a passenger is seized as well and so may challenge the constitutionality of the stop." Brendlin v. California, 551 U.S. _____(2007), (No. 06-8120, p.1). Certiorari was granted "to decide whether a traffic stop subjects a passenger, as well as a drive, to Fourth Amendment seizure." Id.,at 4. The Supreme Court so held. Therefore, Casey has standing to object to an unlawful traffic stop and search.

B. **THE GOOD SAMARITAN ACT TURNED INTO A TRAFFIC STOP-** In Terry v. Ohio, the Supreme Court held that a police officer may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. Terry v. Ohio, 392 U.S.1, 22-24. The investigatory detention may be initiated only if the police officer has reasonable, articulable suspicion of criminal activity. Id, at 21-22. Inarticulate hunches and generalized suspicions are insufficient. Ybarra v. Illinois, 444 U.S. 85,92-92 (1979). The

primary bases for reasonable suspicion are a police officer's personal observation and the collective knowledge of law enforcement personnel. U.S. v. Hensley, 469 U.S. 221, 229, 232-35).

Once Mann told Loughridge to leave the scene, the Good Samaritan act turned into a traffic stop.  Loughridge acted his part. He refused to leave and  threatened to arrest Mann.  This was police officer intimidation or show of authority common in traffic stops for suspected criminal activity.  Although Loughridge testified that he was merely trying to help the Defendants and get their car going, subjective intent of arresting officers is irrelevant in a traffic stop. (See Whren v U.S., 116 S.Ct. 1769 (1996).  The Defendants were committing on crime. However, Loughridge suspected criminal activity based upon the unfriendly conduct of Mann, and the nervousness of the Defendants when he persisted in opening the rear cargo door to find a fuel cut-off switch.  Loughridge was worried enough about criminal activity in his searching of the vehicle that he called another trooper to come to the scene to cover his back while he searched the car in order to prevent any attack by Casey or by Mann, one, large, angry man.  [This cut-off switch engages during accidents and collisions. It was developed by Ford after the famous Pinto cases to prevent gas leaking into the interior of a Ford vehicle after a rear end collision which disrupted the gas tank and fuel lines-Defendants ran out of gas and were not involved in a rear end accident].

5

Loughridge now was engaged in the investigatory part of the traffic stop.

 **C. LOUGHRIDGE EXCEEDED THE SCOPE OF DETENTION AND ENGAGED IN AN SEARCH AND SEIZURE WITHOUT PROBABLE CAUSE -** When police exceed the boundaries permitted by reasonable suspicion, the seizure become an arrest and it must be an arrest based upon probable cause. FLORIDA V. ROYER, 460 U.S. 491, 502-03 (1983)(plurality opinion). The Defendants were now under arrest and Loughridge was searching the vehicle with the help of an intimidated woman.

 In U.S. v. Acosta, 363 F.3d 1141. (11th Cir.2004), the Eleventh Circuit has developed a four part test which distinguishes an investigatory stop for Terry purposes and a detention which calls for an arrest upon probable cause.

> " These factors are: " 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " United States v. Gil, 204 F.3d 1347, 1351 (11th Cir.2000) (quoting United States v. Hardy, 855 F.2d 753, 759 (11th Cir.1988)); see also Sharpe, 470 U.S. at 685-86, 105 S.Ct. at 1575.

Acosta, 363 F.3d at 1146.

 In regard to the first factor, the Court looks to whether the police detained the defendant in a manner which is likely to confirm or dispel suspicions quickly with a minimum of intrusion such as noncustodial questioning. It cannot be used as an excuse for a full blown search that requires probable cause. Acosta, 363 F.3d 1141,1146. In the case at hand, Loughridge engaged in a

defacto interrogation in which he persisted in getting into the cargo area. It weighs against the legality of the stop.

The second inquiry relates to how diligent Loughridge was in pursing his investigation and did they cause unnecessary delay. Acosta, at 1146. He refused to leave when asked to. He came upon motorist parked along side the road. He saw that they were helping themselves. They indicated that they needed no help. And, he saw no evidence of criminal activity immediately. Loughridge should have left instead of prolonging his stay. This factor weighs against the legality of the stop.

The third inquiry asks "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safely. (Cases omitted)." Id. at 1146. Loughridge evidently determined that he was not at risk while he was outside the car and not in the rear cargo area. He was sure enough of himself that he threatened Mann with arrest without drawing his revolver. This facts leans against the legality.

The fourth inquiry is whether the duration of the detention was reasonable. Id at 1147. Loughridge was told to leave. He persisted in getting into the rear cargo area. He called back up to protect his back while he would be reaching inside the cargo area and searching. His actions intimidated the Defendants into going along with his determined desire to get into the cargo area.

Having exceeded the scope of his Terry detention, the

Defendants were under a defacto arrest. Therefore, in order to get into the cargo area, Loughridge needed probable cause to search. U.S. v. Acosta, 363 F.3d 1141, 1145-1146.

Loughridge had no probable cause. He did not testify about any criminal activity. He was only suspicious when the defendants became nervous when he wanted to get into the locked rear cargo area, and he was afraid to be alone with the two men when he started searching.

The search of the vehicle in which the firearms were found and seized was unreasonable and illegal because it was conducted without probable cause, without a valid arrest, arrest warrant, a search warrant, or court order, in violation of the Fourth and Fifth Amendments of the United States Constitution. All evidence seized should be excluded by application of Weeks v. U.S., 232 U.S. 383,398 (1914), Mapp v. Ohio, 367 U.S. 643 (1961).

All fruits of the illegal searches and seizures and the statements should be suppressed. U.S. v. Leon, 468 U.S. 897 (1984), Massachusetts v, Sheppard, 468 U.S. 981 (1984). All statements made by Casey were unlawfully obtained as being "fruit of the poisonous tree".

    S/Paul R. Cooper  
    Paul R. Cooper  
    COOPER & COOPER  
    12 Scott Street  
    Montgomery, AL 36104  
    Phone: (334)262-4887  
    Fax: (334)262-4880  
    E-mail: prc@cooperandcooperlaw.com

ASB-1152-R78P

**CERTIFICATE OF SERVICE**

I hereby certify that on the June 23, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Susan Redmond, Assistant United States Attorney, and I hereby certify that I have mailed by United States Postal Service the documentation to the following non-CM/ECF participants: none.

>
> Respectfully Submitted,
>
> S/Paul R. Cooper
> Paul R. Cooper
> COOPER & COOPER
> 312 Scott Street
> Montgomery, AL 36104
> Phone: (334)262-4887
> Fax:   (334)262-4880
> E-mail: prc@cooperandcooperlaw.com
> ASB-1152-R78P